# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

—————

No. 02-2236

—————

Mark Edward Lomholt, Sr.,        *
                                  *

        Plaintiff-Appellant,       *

                                  * Appeal from the United States

     v.                             * District Court for the Northern

                                  * District of Iowa.

State of Iowa,               *

                                  *

        Defendant-Appellee.     *

—————

Submitted: December 9, 2002
Filed: April 29, 2003

—————

Before WOLLMAN, HEANEY, and MELLOY, Circuit Judges.

—————

MELLOY, Circuit Judge.

State prisoner Mark Edward Lomholt, Sr., appeals the district court's[1] denial of his petition for habeas corpus relief. He alleges violation of his Sixth Amendment confrontation rights based on the use of sequestered, closed-circuit testimony from the two children who were victims of his sexual abuse. The district court rejected

———————————

[1]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

his claims under the deferential standards of 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1218. We affirm.

I.

An Iowa jury convicted Lomholt on two counts of second degree sexual abuse under Iowa Code §§ 709.1 and 709.3. Lomholt's victims were B.G., his four-year-old niece, and N.P., her five-year-old, female friend. Evidence against Lomholt included his signed confession as well as testimony from B.G. and N.P. The confession was corroborated by testimony from N.P.'s mother regarding a change in N.P.'s personality following the period of abuse. The confession was also corroborated by evidence that during identified periods of time Lomholt, as a baby-sitter, was alone with the children and had the opportunity to commit abuse.

The victims were allowed to testify at trial via closed-circuit television pursuant to Iowa Code § 910A.14 (now codified as § 915.38(1)) which permits a court to "protect a minor . . . from trauma caused by testifying in the physical presence of the defendant where it would impair the minor's ability to communicate . . ." and where there has been "a specific finding by the court that such measures are necessary to protect the minor from trauma." Id. Before admitting the closed-circuit testimony from the victims, the Iowa trial court held an evidentiary hearing and set forth factual findings as required by Iowa Code § 910A.14 and Maryland v. Craig, 497 U.S. 836, 856 (1990) (holding face-to-face confrontation to be an important but dispensable element of Sixth Amendment confrontation rights and setting forth the requirement that trial courts must make case-specific findings regarding trauma to child victims before the use of testimony via closed circuit television may be admitted).

At the evidentiary hearing, Lomholt presented no evidence nor witnesses to rebut the testimony of the prosecution's only witness, the victims' sex abuse counselor, Ms. Patricia A. Tomson. The Iowa trial court specifically noted that it found Ms. Tomson to be credible. Based on Ms. Tomson's unrebutted testimony, which we discuss in some detail below, the Iowa trial court concluded:

> the State produced credible testimony that testifying in the physical presence of the defendant would be traumatic to each of the alleged victims. In addition, the evidence was convincing that the trauma experienced in testifying would impair the ability of the witnesses to communicate. The court finds that testimony by closed circuit equipment is necessary to protect the alleged victims from trauma.

Iowa v. Lomholt, No. 4311 at 3 (Iowa Dist. Ct. for Mitchell County July 8, 1996) (Ruling on Motion to Permit Testimony by Closed Circuit Television).

Following conviction and denial of a request for post-trial relief, Lomholt advanced his Sixth Amendment argument before the Iowa Court of Appeals. The Iowa Court of Appeals affirmed the trial court's rulings and held the factual findings sufficient to satisfy the requirements of Craig, 497 U.S. at 855-56. The Iowa Court of Appeals held in the alternative that, had the admission of the children's testimony been a Sixth Amendment violation, it would have been harmless error in light of Lomholt's corroborated confession. The Iowa Supreme Court declined further review, and federal habeas proceedings followed.

The district court expressly noted that it believed the factual findings of the Iowa courts to be incorrect. Lomholt v. Burt, 219 F. Supp. 2d 977, 992 (2002) ("In short, this court agrees with [the federal magistrate's report and recommendation] that the trial court's findings were 'wrong,' or at least, were based on evidence that this court would not find satisfactory if this court were the finder of fact."). Nevertheless, the district court carefully reviewed the evidence of record, found support for the

factual findings, and held the findings to be reasonable under 28 U.S.C. § 2254(d)(2). Accepting the Iowa courts' factual findings as reasonable, the district court proceeded to find the Iowa courts' application of Craig to those facts reasonable under the standard set forth in Williams v. Taylor, 529 U.S. 362, 409-13 (2000).

## II.

In the habeas setting, a federal court is bound by the AEDPA to exercise only limited and deferential review of underlying state court decisions. 28 U.S.C. § 2254. Under this deferential standard, the federal court may not grant habeas relief to a state prisoner merely because the federal court might have reached a conclusion different than that reflected in the state courts' factual determinations. 28 U.S.C. § 2254(d)(2) and (e)(1). Similarly, the federal court may not grant habeas relief to a state prisoner merely "because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Williams, 529 U.S. at 411. Rather, in the interest of furthering the goal of finality and respecting the principles of federalism,

> [t]he Antiterrorism and Effective Death Penalty Act (AEDPA) mandates that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless" the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)

Robinson v. Crist, 278 F.3d 862, 865 (8th Cir. 2002).

A state court decision is contrary to clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the]

4

Court on a question of law or . . . decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves an unreasonable application of clearly established Supreme Court precedent "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. Finally, a state court decision involves "an unreasonable determination of the facts in light of the evidence presented in state court proceedings," 28 U.S.C. § 2254(d)(2), only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record. 28 U.S.C. § 2254(e)(1); Boyd v. Minnesota, 274 F.3d 497, 501 n4 (8th Cir. 2001) ("There is sufficient record evidence to support such a finding and, thus, it would not constitute an unreasonable determination of the facts in light of the evidence presented at trial.").

## III.

The Iowa courts correctly identified Craig as the controlling and clearly established Supreme Court precedent. Under Craig, before a defendant may be deprived the opportunity to confront a child witness face-to-face, there must be a case-specific finding that the "use of the one-way, closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify," "that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant," and "that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, *i.e.*, more than 'mere nervousness or excitement or some reluctance to testify.'" Craig, 497 U.S. at 855-56 (citations omitted). The Court did not attempt to define the minimum level of trauma required but noted that the level of trauma would be sufficient if it "would impair the child's ability to communicate." Id. at 857.

Lomholt attacks the reasonableness of the Iowa courts' factual findings and application of Craig. There is no allegation that the Iowa courts' legal conclusion was contrary to Craig or any other clearly established Supreme Court precedent. Accordingly, our review is limited to two questions: (1) did the Iowa courts make an unreasonable factual determination in light of the evidence presented, or (2) did the Iowa courts unreasonably apply Craig to these facts.

We will first examine the Iowa court's factual findings. Lomholt argues that the findings were unreasonable because there was no showing that the children would be more traumatized specifically by his presence than generally by the courtroom experience and because Ms. Tomson's projections of likely harm to the children described only *de minimis* anxiety rather than trauma as required under Craig. While Lomholt attacks the factual bases of Ms. Tomson's testimony and alleges that she was biased, he does not attack her qualifications.

A careful review of the trial court's findings and Ms. Tomson's unrebutted hearing testimony is necessary to address Lomholt's arguments. The Iowa Court of Appeals described her testimony from the evidentiary hearing:

> Tomson testified B.G. became anxious when describing the abuse and wet her pants on one occasion. She stated B.G. indicated she felt "sad and tired" when she thought of Lomholt. Her drawing of herself did not include arms which Tomson stated was an indication of powerlessness. . . . Tomson maintained N.P. was afraid of Lomholt and played like a baby when the subject was broached. Tomson testified N.P. said she was frightened of Lomholt and that "she doesn't want to see him. Her words are, I want him to stand in the corner for a long, long time." Tomson further testified it would be "very traumatic" for either child to testify in Lomholt's presence. She stated, "I'm not sure either child would talk." Tomson also thought testifying before Lomholt would impair both girls' ability to testify and make it less likely they would tell the truth.

6

Iowa v. Lomholt, No. 7-588/96-1965 at 4 (Iowa Ct. App. 1998). In addition, Tomson testified that B.G. was reluctant to talk about Lomholt and that when Tomson tried to discuss Lomholt with her, B.G. would resort to talking like a baby, become hard to understand, and engage in distracting behavior. Evid. Hearing Trans. at 16. Finally, Tomson testified that B.G. was "pretty disintegrated emotionally, particularly when thinking about the subject we were talking about which was court . . . ." Evid. Hearing Trans. at 10.

Whereas Tomson expressly noted that N.P. was afraid of Lomholt, she did not unequivocally state that B.G. was afraid or unafraid of Lomholt.[2]

_____

[2]Lomholt argues that Tomson specifically testified B.G. was not afraid of Lomholt. The relevant testimony does not support Lomholt's position. The relevant questions from defense counsel and responses from Tomson were as follows:

Q. I want to discuss [B.G.] right now. Is [B.G.] scared of the defendant?
A. When I asked her that question directly, she didn't answer me. She had a relationship with [Lomholt]. He was her care giver. So I'm not certain that she's frightened of him.
Q. How about [N.P.]?
A. Yes, [N.P.] is frightened of [Lomholt].
Q. How do you know this?
A. She has said that she is. She doesn't want to see him. Her words are, I want him to stand in a corner for a long, long time.
Q. How about [B.G.]? Is she apprehensive or scared about testifying in court with [Lomholt] present?
A. [B.G.]'s anxious about talking about the abuse at all. I was present when she talked with you about that. And she sat in my lap and did as many distracting things as she could rather than talk about what had happened to her. The fact that she resorts to baby talk and is very difficult to understand when she starts talking about the abuse. And the fact that she wets her pants or has – now she asks to go to the bathroom, but at first, she didn't. She just wet her pants.

7

Tomson testified in response to questions from the prosecutor that she believed it would be "very traumatic" for the children to testify in court in front of the defendant. The defense attorney challenged this testimony, and Tomson clarified that while the children may have trouble talking in a different room where only the attorneys and the judge would be present, testifying in front of the defendant would

Evidentiary Hearing Transcript at 15-16.

Q. It's your testimony that you don't believe [B.G.] is afraid of [Lomholt]?
A. She has not indicated that to me.
Q. And since she broke off any kind of relationship, you really don't know today what her mental thought pattern is or her ideas are on [Lomholt]?
A. No, I don't.

Evidentiary Hearing Transcript at 23.

Q. You testified that [B.G.] has never told you that she is afraid of [Lomholt]?
A. That's right.
Q. Based on her drawings and based upon your other communications with her, has she indirectly indicated that she's afraid of [Lomholt]?
A. Based on her drawings, there is more indication that of shame about talking about the abuse than of [Lomholt] himself.
Q. Based upon your education, based upon your experience, would testifying in the physical presence of Mark Lomholt impair [B.G. and N.P.]'s ability to communicate?
A. Yes, it would.

Evidentiary Hearing Transcript at 24-25.

be different.[3]  Finally, Tomson testified about studies involving children other than B.G. and N.P. and stated that, in her expert opinion, it would be traumatic for any children who had been sexually abused to testify in front of their abusers.  Evid. Hearing Trans. at 19-20.  Lomholt points to these comments in particular to support his argument that the evidence was not sufficiently case-specific.

In summary, Ms. Tomson provided a detailed account of her counseling sessions with both girls, specifically testified that she believed it would be "very traumatic" for them to testify in front of Lomholt, and specifically noted that testifying in front of Lomholt would be different than testifying outside of his presence.  We note that the Court in <u>Craig</u> stated that expert testimony could provide a sufficient basis for the factual findings necessary to admit closed-circuit testimony.  <u>Craig</u>, 497 U.S. at 860 ("The trial court in this case, for example, could well have found, on the basis of the expert testimony before it, that testimony by the child witnesses in the courtroom in the defendant's presence 'will result in [each] child suffering serious emotional distress such that the child cannot reasonably communicate.'") (citations omitted).  Here, Lomholt failed to rebut such testimony and the Iowa courts deemed it credible.  Further, Ms. Tomson's qualifications were unchallenged.  Accordingly, the fact that the Iowa courts' findings were based solely on the testimony of one expert does not provide a basis for finding the Iowa courts' findings unreasonable.

---

[3]Q.  And you said that [B.G. and N.P.] would have trouble talking.  They may have trouble talking in a different room with just myself, [the prosecutor] and the judge present; is that correct?

A.  Yes, they may.

Q.  So there actually may be no difference between that and a courtroom setting?

A.  I believe there would be a difference.

Evidentiary Hearing Transcript at 22.

9

In light of Ms. Tomson's conclusions and her discussion of the children's behavior during counseling sessions, it was not unreasonable for the Iowa courts to conclude that the emotional impact described by Ms. Tomson was "more than *de minimis, i.e.* more than 'mere nervousness or excitement or some reluctance to testify.'" Craig, 497 U.S. at 856 (citations omitted). Ms. Tomson specifically noted that testifying before Lomholt would be "very traumatic" and that this trauma would be sufficient to impair the girls' ability to communicate. It is not fatal to Ms. Tomson's testimony that she did not unequivocally state that B.G. was afraid of Lomholt. As noted in footnote 2, supra, Ms. Tomson did not testify that B.G. was *unafraid* of Lomholt. To attribute such a statement to Ms. Tomson would be to ignore the deference owed to the findings of the Iowa courts.

Further, even if she had provided such testimony, the Supreme Court requires a showing of trauma, not necessarily a showing of fear. See Craig, 497 U.S. at 856, 857 and 860 (describing the requisite impact on a child-witness as "emotional trauma," "serious emotional distress," and "serious emotional distress such that the child cannot reasonably communicate."). Fear, shame, guilt, and countless other emotions may overwhelm a child victim's ability to communicate. The Court in Craig appropriately omitted any narrow descriptions that would have limited the type of trauma necessary to overcome a defendant's confrontation rights. The Iowa courts' refusal to read such a limitation into the definition of trauma does not make their factual findings unreasonable.

Similarly, it was not unreasonable for the Iowa courts to conclude that Ms. Tomson's testimony adequately differentiated between trauma attendant to the general experience of testifying in court and trauma attendant to testifying before Lomholt. She stated that the latter would be "very traumatic" and that this experience would be different than testifying only before the judge and the attorneys. While more testimony in this regard would have strengthened the Iowa courts' conclusions, we cannot find the evidence so lacking that we may declare those conclusions unreasonable.

10

Turning to the reasonableness of the Iowa courts' application of Craig, Lomholt argues that the Iowa courts failed to enforce the case-specific requirement of Craig. Specifically, Lomholt argues that Ms. Tomson's blanket statement that all child-victims of sexual abuse would be traumatized if forced to testify in front of their abuser demonstrates that her opinions were not case-specific. If her general statements had comprised the entirety of her testimony, Lomholt's attack might warrant a grant of relief. However, Tomson's general statement concerning all child victims was an isolated statement at the end of her testimony following a detailed discussion concerning her counseling sessions with both victims. As noted by the district court, "the fact that case-specific observations and conclusions are consistent with an expert's general opinions or other studies concerning the reaction of young children to testifying about wrongdoing in the presence of the perpetrator doesn't mean that the expert's opinion concerning the specific children in question wasn't 'case-specific.'" Lomholt v. Burt, 219 F. Supp. 2d at 998. Given the detailed accounts of sessions with each child and the separate discussions of each child's reactions, it was not unreasonable for the Iowa courts to conclude that Ms. Tomson's testimony satisfied the case-specific requirement of Craig.

The district court is affirmed.

HEANEY, Circuit Judge, dissenting.

By finding B.G. would be traumatized by Lomholt's presence at trial, the state trial court unreasonably determined the facts in light of the evidence presented. Similarly, allowing closed circuit television testimony without evidence that it was necessary to protect B.G. from trauma associated with Lomholt's presence is an unreasonable application of Maryland v. Craig, 497 U.S. 836 (1990), the governing Supreme Court precedent on this matter. As habeas relief is appropriate both where there has been an unreasonable determination of the facts and where there has been an unreasonable application of the law, see 28 U.S.C. § 2254(d), I would grant the petition in part in this matter. I therefore dissent from that portion of the majority's

11

opinion that affirms the district court's denial of habeas relief with regard to Lomholt's conviction involving B.G.

Subject to a limited number of exceptions, a criminal defendant enjoys the well-established constitutional right to face his accusers. One of those exceptions exists for child witnesses who would be severely traumatized by testifying in front of their victimizers. Craig makes clear that to satisfy the Confrontation Clause when a witness testifies via closed circuit television, the government must establish that testifying in this manner is necessary to protect the welfare of the child. 497 U.S. at 855 (1990). This inquiry is case-specific; the government cannot rely on general evidence that children as a group are traumatized by testifying. Id. Moreover, it does not suffice to show that the child may be traumatized by the court process. The touchstone is whether the defendant's physical presence causes the child harm. Id. at 856 ("[I]f the state interest were merely the interest in protecting the child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present.") In other words, to deny a defendant face-to-face confrontation of his accuser, the evidence must establish that "the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant." Id.

Consistent with the above standard, in order to allow B.G. to testify by closed circuit television, the state was required to show that B.G. would have be traumatized by Lomholt's presence at trial. The trial court concluded that "the State produced credible testimony that testifying in the physical presence of the defendant would be traumatic to each of the alleged victims." The record simply does not support such a finding as to B.G.

The state produced a single witness, Patricia Tomson, at the hearing on this matter. Tomson testified that, in her expert opinion, it would be traumatic for all four- or five-year-old children to testify in front of their abuser. She also testified

12

that, based on part of a study she had read, she thought it was less likely that children would tell the truth in front of their accusers. She also concluded that based on the children's "anxiousness," testifying in front of the defendant would be "very traumatic and I'm not sure either child would talk." (Evidentiary Hr'g Tr. at 16.)

With regard to N.P., Tomson's specificity supports her conclusion that it would be traumatic for N.P. to talk in front of Lomholt. N.P. had been treated by Tomson for some time, and she specifically told Tomson that she "is frightened of Mark [Lomholt] . . . . She has said that she is. She doesn't want to see him. Her words are, I want him to stand in a corner for a long, long time." (Id. at 15.) Tomson also observed that N.P. would divert attention from talking about the abuse, and would draw pictures that Tomson interpreted to show a feeling of powerlessness and lack of family support.

The evidence did not support such a conclusion for B.G. Tomson testified that she only saw B.G. for a total of three or four weeks, and had not seen B.G. for nearly six weeks before the hearing. She stated that when she first saw B.G., B.G. would become anxious when talking about the abuse and would wet her pants. Tomson went on to testify that Lomholt was B.G.'s uncle, and that B.G. may not be truthful in front of him for fear of getting him in trouble. B.G. had told Tomson that thinking about Lomholt made her feel "sad and tired." (Id. at 7.) Notably, when asked specifically if B.G. was frightened of Lomholt, Tomson stated B.G. "had a relationship with [Lomholt]. He was her care giver. So I'm not certain she's frightened of him." (Id. at 15.) She reiterated on cross-examination that she did not believe B.G. was scared of Lomholt, but that "[i]t's very hard for people to testify in front of anyone they have a relationship with." (Id. at 23.) On re-direct, when asked if B.G. had indicated indirectly that she was afraid of Lomholt, Tomson stated that she interpreted B.G.'s drawings to be "more indication . . . of shame about talking about the abuse than of [Lomholt] himself." (Id. at 24.) Because B.G. had discontinued treatment with Tomson six weeks prior to the hearing, Tomson conceded that she did not know B.G.'s current mental state.

13

Tomson's testimony that any four- or five-year-old would be traumatized by testifying in front of their abuser does not satisfy the Supreme Court's requirements for permitting child witnesses to testify via closed circuit television. Craig mandates that the inquiry must be case-specific: The government must show that this particular child, B.G., would be traumatized because of the defendant's presence. Craig, 497 U.S. at 855, 858.

As to the rest of the government's evidence, Tomson testified that B.G. was ashamed of her abuse, and was anxious when talking about it. This is different from being harmed by the defendant's presence in court. Despite several attempts to elicit such testimony, the government could not adduce evidence that B.G. was scared of Lomholt. Other than Tomson's general statements regarding all children, the government also failed to elicit specific evidence that B.G. would be traumatized by Lomholt's presence at trial. Under the governing law of Craig, I believe that allowing B.G. to testify by closed circuit television violated Lomholt's Confrontation Clause rights.[4]

After finding a violation of Lomholt's constitutional right to confront his accuser, the next question is if any relief is warranted. See Delaware v. Van Arsdall, 475 U.S. 673, 681-82 (1986) (holding Confrontation Clause violations are subject to a harmless error inquiry). The proper analysis on remand would be to completely exclude the child witness's testimony, and consider the strength of the remaining evidence against the defendant. Coy v. Iowa, 487 U.S. 1012, 1021-22 (1988).

---

[4]Although the majority notes that Lomholt failed to rebut Tomson's testimony, he is not required to do so. As the Craig court made clear, the state bears the burden of proof in these matters. Craig, 497 U.S. at 855. Generalized and conclusory statements from a person who had known the victim for only three or four weeks and had not spoken to the victim for six weeks prior to the hearing is not sufficient to carry the day. Therefore, Lomholt was under no obligation to produce contrary evidence, as the majority suggests.

14

Without B.G.'s testimony, I do not believe there is sufficient evidence to sustain a conviction with regard to her. Lomholt confessed, but he then recanted. Under Iowa law, "[t]he confession of the defendant, unless made in open court, will not warrant a conviction, unless accompanied with other proof that the defendant committed the offense." Iowa Code § 813.2, Rule 20(4). The majority of the remaining evidence appears to be the testimony B.G., or hearsay testimony of the children's mothers, recounting what the children had told them. Excluding all of this testimony, as we are required to do, it does not appear there is enough remaining evidence to convict Lomholt with respect to B.G. Accordingly, I would grant Lomholt's petition as to that conviction.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

15